IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Bankruptcy No. 13-70334-JAD |
| BG PETROLEUM, LLC, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | Related to Doc. Nos. 231, 232 & |
| | ) | 271 |
| _____ | X | |

## MEMORANDUM OPINION

The dueling motions before the Court consist of an *Expedited Motion to Enforce Settlement* (the "Motion to Enforce Settlement"), an *Amended Expedited Motion for Relief From Stay* (the "Motion for Relief From Stay"), and an *Amended Expedited Motion for Appointment of Chapter 11 Trustee* (the "Motion to Appoint Trustee").

With respect to the Motion to Enforce Settlement, the movant is BG Petroleum, LLC, which is the debtor-in-possession in this Chapter 11 bankruptcy case. The respondents to the Motion to Enforce Settlement, are Clinton D. Simmons, Robert K. Simmons, Loretta M. Simmons, Nyle Mellott, Joan Mellott, Thomas Waters, Ladonna Waters, Bedford County Oil Company, Inc., Simmons Realty Company, Inc. and Sunco Enterprises, Inc. (collectively, the "Simmons Group").

By the Motion to Enforce Settlement, BG Petroleum, LLC contends that it entered into a binding settlement agreement with the Simmons Group, which in-

00014919

turn will enable the debtor-in-possession to propose a confirmable plan of reorganization.    The Simmons Group, however, contends that there was no "meeting of the minds" and that no settlement agreement was reached between the parties.

Given this stalemate, and dissatisfied with the direction in which this Chapter 11 case has been progressing, the Simmons Group has asked this Court for additional relief against BG Petroleum, LLC.  Specifically, by the Motion for Relief From Stay, the Simmons Group has asked that this Court  determine that a valuable ground lease (the "Ground Lease") of BG Petroleum, LLC be deemed terminated and that the automatic stay be lifted so that the Simmons Group can evict the debtor-in-possession from its business premises.  In addition, citing the alleged acrimony between the parties and other alleged "cause," the Simmons Group filed its Motion to Appoint Trustee.  By the Motion to Appoint Trustee, the Simmons Group asks that this Court enter an order which removes existing management of BG Petroleum, LLC and replace it with a Chapter 11 trustee.

This Court has jurisdiction to enter final judgment with respect to Motion to Enforce Settlement, the Motion for Relief From Stay, and the Motion to Appoint Trustee (collectively, the "Motions") pursuant to 28 U.S.C. § 1334(b).  The Motions are also core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G), (M), and (O).[1]

---

[1] Both BG Petroleum, LLC and the Simmons Group, through their counsel, also consented to this Court's entering final judgment as to the Motions.  Such consent is sufficient to
(continued...)

For the reasons that are set forth below, and in due consideration of the evidence and legal arguments presented to the Court, an order shall be entered that grants the Motion to Enforce Settlement and denies, without prejudice, the Motion for Relief From Stay and the Motion to Appoint Trustee.

## I.

The background of this case is not uncomplicated. Prior to May 1, 2012, Clinton D. Simmons, his brother Robert K. Simmons and their mother, Loretta M. Simmons, along with Nyle Mellot and Thomas Waters were the principal owners of Simmons Realty Company, Inc.

Simmons Realty Company, Inc. owned and leased parcels of commercial real estate for the operation of convenience stores, commercial fuel sales, and restaurant operations.

Clinton D. Simmons and Robert K. Simmons also owned Sunco Enterprises, Inc. ("Sunco"). Sunco leased real estate from Simmons Realty Company, Inc. and operated a number of convenience stores, full service gas stations, car washes, franchised restaurants, and a Flying J truck stop located in Breezewood, Pennsylvania.

Clinton D. Simmons, Robert K. Simmons, Loretta M. Simmons, Nyle Mellot,

---

[1](...continued)

allow this Court to hear and finally determine the matter, regardless of whether it is statutorily defined as "core" or "non-core" pursuant to 28 U.S.C. § 157. See ARDI Ltd. P'ship v. The Buncher Co. (In re River Entertainment Co.), 467 B.R. 808 (Bankr. W.D. Pa. 2012).

and Thomas Waters collectively held a 53% ownership interest in Bedford County Oil Company, while the remaining 47% was owned by Bedford County Oil Company employees through an employee stock ownership plan.

Bedford County Oil Company owned and operated a commercial fuel distribution system that annually transported and sold approximately 40 million gallons of truck and automotive fuel to dealers and commercial accounts, including approximately 12 million gallons at the Flying J truck stop referenced above.

The debtor-in-possession, BG Petroleum, LLC, is a Maryland limited liability company with a registered business address located in Frederick, Maryland.

Gerald P. Dever and Bradley Gray were at one time the principal owners of BG Petroleum, LLC.  Bradley Gray's interests were terminated sometime before this bankruptcy case was commenced.  As of the date when this bankruptcy case was commenced, William Miller and Attilio DeMarco had 80% ownership stake in BG Petroleum, LLC, while Gerald Dever retained a 20% ownership interest in the debtor-in-possession.

On May 1, 2012, Bedford County Oil Company, Simmons Realty Company, Inc., and Sunco, collectively, entered into a ground lease with BG Petroleum, LLC (the "Ground Lease").

Pursuant to the Ground Lease, BG Petroleum, LLC was to take possession, control and operational responsibility for each of Bedford County Oil Company's,

Simmons Realty Company Inc.'s and Sunco's businesses and assets (including the Flying J truck stop referenced above). In addition to the obligation of making monthly payments to each of Bedford County Oil Company, Simmons Realty Company, and Sunco, the Ground Lease also required that BG Petroleum, LLC pay obligations arising in connection to the operations of those entities and their assets arising from and after the date of the Ground Lease.

On May 3, 2013, Nyle Mellott and his wife, Joan Mellott, Robert K. Simmons, Clinton D. Simmons, Loretta M. Simmons, Thomas Waters and his wife, Ladonna Waters (collectively, the "Petitioning Creditors"), commenced this case by filing an involuntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

In petitioning for involuntary bankruptcy relief against BG Petroleum, LLC, the Petitioning Creditors claimed debts totaling $791,040.91, purportedly arising from fuel taxes they paid on behalf of BG Petroleum, LLC. Robert Clinton and Loretta Simmons each claimed $87,893.43 due, while both Mr. and Mrs. Mellot and Mr. and Mrs. Waters each claimed $263,680.31 per couple.

On May 21, 2013, Bedford County Oil Company, Simmons Realty Company, Inc., and Sunco joined as Petitioning Creditors. In this regard, Bedford County Oil Company claimed $3,100,001.94 of purported operating expenses and rent due it under the Ground Lease. Simmons Realty Company, Inc. claimed $810,000 of purported rent under the Ground Lease; and Sunco claimed $24,400.74 of

00014919                                    -5-

purported rent due under the Ground Lease.

On May 31, 2013, BG Petroleum, LLC filed a *Stipulation for Extension of Time to Respond to Involuntary Petition, Together with Related Stipulations* (the "Stipulation"). The Stipulation requested an extension of BG Petroleum, LLC's response deadline to the involuntary petition until June 14, 2013. The Stipulation also imposed restrictions on the Petitioning Creditors and BG Petroleum, LLC during that additional time, and provided that the parties would continue to negotiate a possible settlement, including scheduled meetings on June 5, 2013 at the offices of the Petitioning Creditors' counsel and June 11, 2013 at the offices of BG Petroleum, LLC's counsel.

On June 14, 2013, BG Petroleum, LLC filed a *Motion Seeking an Order Granting a Further Extension of Time to Respond to Involuntary Petition*. The primary basis for BG Petroleum, LLC's request was that an extension would afford the parties an opportunity to amicably resolve a number of their disputes through ongoing negotiations, potentially resulting in a consensual dismissal of the involuntary petition. On June 16, 2013, the Court entered an Order extending BG Petroleum, LLC's response deadline to June 28, 2013.

On June 28, 2013, BG Petroleum, LLC filed a *Motion to Dismiss Involuntary Chapter 11 Petition Pursuant to Bankruptcy Rule 1011 and for Judgment Against Petitioning Creditors Pursuant to 11 U.S.C. Section 303(i)* (the "Motion to Dismiss & for Judgment").

BG Petroleum, LLC's Motion to Dismiss & for Judgment included allegations that the Petitioning Creditors violated the Ground Lease by failing to leave adequate cash on hand or accounts receivable. BG Petroleum, LLC alleged that the Petitioning Creditors wrote checks totaling $767,082.77 to themselves three days prior to the Ground Lease closing date and cashed those checks after the closing. BG Petroleum, LLC alleged that the Petitioning Creditors' actions both breached the Ground Lease and caused BG Petroleum, LLC's financial problems. BG Petroleum, LLC further alleged that the filing of an involuntary petition against BG Petroleum, LLC was done in bad faith.

On July 31, 2013, the Petitioning Creditors filed a *Response to BG Petroleum, LLC's Motion to Dismiss & for Judgment* (the "Response"). In their Response, the Petitioning Creditors denied any failure to leave less than the full amount of cash on hand (or accounts receivable) under the terms of the Ground Lease. The Petitioning Creditors admitted that checks were drawn in the aggregate amount of $767,082.77 prior to closing on the Ground Lease, but denied any related impropriety. Following a hearing held on August 1, 2013, the Court scheduled an evidentiary hearing for October 10, 2013 on the Motion to Dismiss & for Judgment.

On August 28, 2013, a *Stipulation* was filed by Mediator Norman E. Gilkey, Esq., confirming that the Petitioning Creditors and BG Petroleum, LLC requested to have their disputes mediated through the Court's Mediation Program. On

August 30, 2013, representatives of the Petitioning Creditors and BG Petroleum, LLC, with full settlement authority and the presence of respective counsel, participated in an eight (8) hour mediation session at Norman Gilkey's Pittsburgh office.

On September 5, 2013, Norman Gilkey filed a *Mediator's Certificate of Completion of Mediators Conference*, reporting that the mediation successfully resulted in a settlement and that within thirty (30) days the parties would be submitting to the Court a *Motion for Approval of Settlement* (a "Rule 9019 Motion"). No Rule 9019 Motion was filed within this thirty (30) day time period so the Court did not cancel the hearing scheduled for October 10, 2013.

At the October 10, 2013 Hearing, and upon the belief that the parties had settled their differences, the Court ordered the parties to file their Rule 9019 Motion within fourteen (14) days. The Court also continued an evidentiary hearing on BG Petroleum, LLC's Motion to Dismiss & for Judgment until November 22, 2013.

After an extension of time was further granted by the Court, the Petitioning Creditors filed a Rule 9019 Motion on November 7, 2013. The Court then entered an order scheduling a hearing for December 19, 2013 on the Rule 9019 Motion.

On November 19, 2013, BG Petroleum, LLC filed a motion requesting that the hearing originally scheduled for November 22, 2013 on BG Petroleum, LLC's Motion to Dismiss & for Judgment be rescheduled pending the Court's approval

or disapproval of the Petitioning Creditors' Rule 9019 Motion--which was scheduled for December 19, 2003. The Court granted BG Petroleum, LLC's request and rescheduled the evidentiary hearing on BG Petroleum, LLC's's Motion to Dismiss & for Judgment for December 19, 2013 as well.

On December 9, 2013, BG Petroleum, LLC filed a *Limited Objection* to the Rule 9019 Motion. In its Limited Objection, BG Petroleum, LLC agreed that the August 30, 2013 mediation session resulted in a mutual settlement and supported the Court's approval of that agreement. However, BG Petroleum, LLC also raised two concerns or objections to the terms as set forth in the Rule 9019 Motion as drafted and filed by the Petitioning Creditors. These concerns or objections of BG Petroleum, LLC were based on alleged departures from the mutually executed term sheet that was prepared by Norman Gilkey and signed by the parties at the culmination of the successful mediation (the "Mediated Term Sheet").

The Mediated Term Sheet is an extensive hand written document, that is six (6) pages in length. A copy of the Mediated Term Sheet is appended hereto and marked "Appendix A".

The Mediated Term Sheet is comprehensive. It provides BG Petroleum, LLC with the opportunity to purchase Ground Lease assets (described in the Mediated Term Sheet as "A-1, A-2, and A-3 properties") for $14.5 million, payable over time.

The Mediated Term Sheet also sets forth other terms and conditions such as: the requirement that the properties be conveyed via good and marketable title;

the granting of a purchase money security interest to the sellers as security for the purchase price due and payable by BG Petroleum, LLC; upon payment of $6 million from BG Petroleum, LLC, the execution of a note (the "Note") payable by BG Petroleum, LLC in the amount of $8.5 million in favor of the sellers; the payment of taxes by BG Petroleum, LLC; the maintenance of the Flying J franchise; mutual releases; and the structured dismissal of the Chapter 11 case (along with a consensual termination of the Ground Lease as BG Petroleum, LLC is purchasing the assets) upon Court approval of the Rule 9019 Motion.

In essence, the Mediated Term Sheet provides for a way in which BG Petroleum, LLC could obtain a release from the Simmons Group and convert its interest as a "lessee" under the Ground Lease to a fee owner of the subject property, thus obviating the need for further bankruptcy proceedings (assuming that a Rule 9019 Motion is approved upon notice and hearing to all creditors).

In its Limited Objection, BG Petroleum, LLC first pointed out that the Petitioning Creditors' Rule 9019 Motion set forth an annual interest rate of 4.5% on the contemplated Note, while the Mediated Term Sheet specified an annual interest rate of 4.25%.

Second, BG Petroleum, LLC noted in its Limited Objection that the Rule 9019 Motion referenced a schedule of properties with an aggregate total sale price of $14,000,000, while the Mediated Term Sheet specified an aggregate total price of $14,500,000.

BG Petroleum, LLC characterized these discrepancies as reflecting no malfeasance on the part of the Petitioning Creditors, but "simple transcription or math errors" which could be resolved prior to the hearing scheduled for December 19, 2013.

On December 12, 2013, the Court then entered an Order cancelling the evidentiary hearing as to BG Petroleum, LLCs Motion to Dismiss & for Judgment. The Court further ordered that the matter would be rescheduled if the Petitioning Creditors' Rule 9019 Motion was not approved.

A December 19, 2013 hearing on the Rule 9019 Motion was presided over by Bankruptcy Judge Gregory L. Taddonio. By way of an oral motion at the hearing, the Petitioning Creditors withdrew their Rule 9019 Motion.

In connection with withdrawing the Rule 9019 Motion, Petitioning Creditors' counsel asserted that there was an ongoing dispute as to whether the Note in the amount of $8,500,000.00 was to be paid over a ten (10) year term pursuant to an alleged amortization schedule or as interest only note with a balloon payment due by BG Petroleum, LLC upon maturity.

BG Petroleum, LLCs counsel argued that the Mediation Term Sheet constitutes an enforceable agreement and there was no reference in that agreement to an amortization schedule for the payment of the Note (thus, they argued it was an interest-only note with a balloon payment due at maturity).

Both parties agreed that the issue of whether the Mediation Term Sheet

constitutes an enforceable settlement agreement could be determined at a subsequent hearing.  With the Rule 9019 Motion having been withdrawn, Judge Taddonio ruled that there was no present matter before him for resolution, and that the matter of the enforceability of the agreement set forth in the Mediation Term Sheet would be heard by the Court at a subsequent hearing.  The Court issued a Bench Order granting the Petitioning Creditors' request to withdraw their Rule 9019 Motion without prejudice.

On February 27, 2014, this Court entered an Order rescheduling an evidentiary hearing on BG Petroleum, LLC's Motion to Dismiss & for Judgment for April 10, 2014.

On March 27, 2014, BG Petroleum, LLC filed a *Pre-Trial Statement* regarding the evidentiary hearing on BG Petroleum, LLC's Motion to Dismiss & For Judgment.  Then, on April 9, 2014, BG Petroleum, LLC filed a *Motion to Withdraw Its Motion to Dismiss*.  In its motion, BG Petroleum, LLC stated that the August 30, 2013 mediation "appeared to be successful," resulting in the Mediation Term Sheet.  BG Petroleum, LLC further stated that:

> During attempts to convert the term sheet to a written settlement agreement for purposes of obtaining Court approval, however, differences between the parties once again arose.  The process of negotiating and re-negotiating settlement on multiple occasions has been a lengthy process and has ultimately proven to be unsuccessful in that the parties have been unable to agree to any consensual motion seeking approval of settlement agreement for filing with this Honorable Court.

Doc. No. 172, ¶5-6.

The primary basis of BG Petroleum, LLC's *Motion to Withdraw Its Motion to Dismiss* was the claim that the delay associated with the negotiation process interfered with BG Petroleum, LLC's financing plans and property transactions, ultimately placing BG Petroleum, LLC in a position where Chapter 11 relief became necessary.  On April 9, 2014, the Court entered an Order granting BG Petroleum, LLC's request to withdraw its *Motion to Dismiss*, and entered an *Order for Relief* under Chapter 11 of the United States Bankruptcy Code.

With the dispute as to the settlement percolating, on May 19, 2014, the Petitioning Creditors filed its preemptive Motion for Appointment of Trustee and Motion for Relief From Stay.  In support of these motions, the Petitioning Creditors referenced a letter to BG Petroleum, LLC dated December 13, 2012 which notified BG Petroleum, LLC of specific instances of default under the Ground Lease and provided BG Petroleum, LLC with an opportunity to cure said defaults. The Petitioning Creditors alleged that BG Petroleum, LLC's failure to cure the defaults resulted in an official termination of the Ground Lease by way of letter to BG Petroleum, LLC dated January 22, 2013.  As a result, the Petitioning Creditors requested that the Court find that: the Ground Lease was terminated prior to the commencement of this case and that the Ground Lease was not and is not "property of the estate."  The Petitioning Creditors therefore asked to be granted relief from the automatic stay to assume possession of the property and assets that had been the subject of the Ground Lease.

In support of its motions, the Petitioning Creditors also referenced an examination of BG Petroleum, LLC's financial records undertaken by the accounting firm of Boyer & Ritter, C.P.A.  The Petitioning Creditors set forth numerous alleged arrearages and defaults attributed to BG Petroleum, LLC by Boyer & Ritter, C.P.A., including but not limited to: delinquent annual rents under the Ground Lease, various delinquent taxes owed to the Commonwealth of Pennsylvania, Maryland, Virginia, West Virginia, and the IRS, and delinquent amounts owed to fuel suppliers and third party vendors.  The Petitioning Creditors also alleged that BG Petroleum, LLC was diverting funds to Tristar Petroleum, LLC, an entity created by and under the control of Attilio DeMarco who is one of BG Petroleum, LLC's principals. The Petitioning Creditors further alleged that despite the purported inability of BG Petroleum, LLC to satisfy its financial obligations, BG Petroleum, LLC paid each of its principals salaries in excess of $150,000 which the Petitioning Creditors claim is imprudent.  The Petitioning Creditors argued that the alleged actions of BG Petroleum, LLC constitute cause for the appointment of a Chapter 11 Trustee pursuant to Section 1104(a) of the Bankruptcy Code.

On May 20, 2014, the Court entered an Order scheduling a hearing on the Petitioning Creditors' Motion for Relief From Stay and Motion for Appointment of Trustee for June 2, 2014, and by Order dated May 22, 2014 rescheduled that hearing for June 5, 2014. On May 29, 2014, BG Petroleum, LLC filed *Responses*

to the Petitioning Creditors' motions. In its *Response* to the Motion for Appointment of Trustee, BG Petroleum, LLC reiterated its allegation that BG Petroleum, LLC's failure to make the payments required by the Ground Lease were caused by the Petitioning Creditors' failure to leave the required amount of cash on hand, having depleted available funds by writing checks totaling $767,082.77 to themselves.

BG Petroleum, LLC further alleged that the parties had settled their disputes twice in the form of enforceable agreements, and therefore the complaints of the Petitioning Creditors ring hollow. BG Petroleum, LLC also alleged that the parties agreed that TriStar was created to assume the operations of Bedford County Oil Company upon Bedford County Oil Company's bankruptcy (as contemplated by the settlement) between the parties, and BG Petroleum, LLC denied any diversion or misuse of funds to TriStar.

BG Petroleum, LLC's response to the Motion for Relief From Stay was premised on essentially the same allegations as its defense to the Motion for Appointment of Trustee. On May 29, 2014, the Petitioning Creditors filed *Amended Motions for Relief from Stay and for Appointment of Chapter 11 Trustee*, with changes to several of the dollar values set forth in their original motions. Substantively, these amended motions sought the same relief, and contained virtually the same allegations, as contained in the Motion for Relief From Stay and the Motion for Appointment of Trustee.

00014919                                          -15-

On June 9, 2014, BG Petroleum, LLC filed an *Expedited Motion to Enforce Settlement.* In its *Motion to Enforce Settlement*, BG Petroleum, LLC claimed that the *Mediated Term Sheet*, prepared by mediator Norman Gilkey, Esq. and executed by the parties on August 30, 2013, constitutes an enforceable agreement. BG Petroleum, LLC further claimed that a document prepared by the parties on January 29, 2014 at the law office of counsel to the Petitioning Creditors (the "*January 29, 2014 Agreement*") constitutes an enforceable agreement as well. In this regard, BG Petroleum, LLC contended that the January 29, 2014 Agreement filled in any "gaps" that were left open by the Mediated Term Sheet.

On June 9, 2014, the Court issued an Order scheduling an evidentiary hearing for June 19, 2014 on the *Expedited Motion to Enforce Settlement.* On June 18, 2014, the Petitioning Creditors filed their *Pre-Trial Statements* and Exhibits related to *Motions for Relief from the Automatic Stay and the Appointment of a Chapter 11 Trustee,* and BG Petroleum, LLC filed a *Joint Stipulation Regarding Exhibits to Be Used at Trial.* On June 18, 2014, the Petitioning Creditors also filed a *Response* to BG Petroleum, LLC's *Expedited Motion to Enforce Settlement.*

With respect to the *Mediated Term Sheet*, the Petitioning Creditors admit in their *Response* "that the parties reached an agreement subject to Bankruptcy Court approval." With respect to the *January 29, 2014 Agreement*, the Petitioning Creditors admit in their response "that the parties agreed to terms of a potential settlement."

Notwithstanding its admissions, the Petitioning Creditors claim in their *Response* that neither the *Mediated Term Sheet* nor the *January 29, 2014 Agreement* remains in effect due to BG Petroleum, LLC's alleged failure to pay taxes and rent and BG Petroleum, LLC's failure to pay Susquehanna Bank and franchisors.

An evidentiary hearing was conducted over the two day period of June 19, 2014 and June 20, 2014, addressing the Petitioning Creditors' Motions for Relief from the Automatic Stay and the Appointment of a Chapter 11 Trustee and BG Petroleum, LLC's Motion to Enforce Settlement.

On June 24, 2014, the Court entered an Order setting a deadline of thirty (30) days after the filing of transcripts for the parties to file their respective Post-Trial Briefs. Transcripts of the Hearings were filed on July 24, 2014. The parties requested various extensions of time to file Post-Trial Briefs, and briefing was completed on or about October 9, 2014. Further hearings were held in the underlying bankruptcy case, and this matter is now ripe for determination.

**II.**

A fundamental question raised by the parties is whether they have reached a legally enforceable settlement agreement, subject to this Court's approval pursuant to Fed.R.Bankr.P. 9019. Having duly considered the evidence presented, the Court concludes that a settlement agreement was reached between the parties.

The legal principles governing the enforcement of an agreement reached at a mediation are articulated in Standard Steel, LLC v. Buckeye Energy, Inc. ("Standard Steel"), Civ. A. 04-538, 2005 U.S. Dist. LEXIS 22378, 2005 WL 2403636 (W.D. Pa. Sept. 9, 2005). See also Elliot v. Marinos, 2:12-1293, 2013 U.S. Dist. LEXIS 115125, 4-5 (W.D. Pa. Aug. 15, 2013).  As relevant to this case, settlements are strongly encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the litigation load of the courts. Standard Steel, 2005 U.S. Dist. LEXIS 22378 at *22 (citing D.R. by M.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir. 1997)). Settlement agreements reached through mediation are as binding as those reached through litigation. Standard Steel , 2005 U.S. Dist. LEXIS 22378 at *22-23 (citing D.R. by M.R. v. East Brunswick Bd. of Educ., 838 F.Supp. 184, 190 (D. N.J. 1993) ("The fact that this Agreement was reached during mediation does not in and of itself diminish the effect of the Agreement, or make it any less of a binding contract. To so hold would create a hierarchy of settlement agreements where some are deemed binding while others are not determinable merely by whether they were reached during mediation or during litigation. Such a rule would create confusion and indefiniteness as to the effect of a settlement agreement. Accordingly, it may have a chilling effect on the use of such agreements as parties would never know whether the matter was finally resolved.")).

Settlement agreements are interpreted as binding contracts. Standard Steel,

2005 U.S. Dist. LEXIS 22378 at *23; see also Enterprise Energy Corp. v. United States, (In re Columbia Gas Systems, Inc.), 50 F.3d 233, 238 (3d Cir. 1995). Thus, settlement agreements are construed according to traditional principles of contract law. Standard Steel, 2005 U.S. Dist. LEXIS 22378 at *23-24; see also Coltec Industries v. Hobgood, 280 F.3d 262, 269 (3d Cir. 2002) (citing In Re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir. 2000) ("[b]asic contract principles ... apply to settlement agreements ....)).

The intent of the parties is a question of fact which must be determined by the factfinder. Standard Steel, 2005 U.S. Dist. LEXIS 22378 at *24 (citing Johnston v.  Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985). If the existence and binding effect of the settlement agreement is contested by the parties, an evidentiary hearing exploring these matters is the appropriate procedure. Id. at *24-25 (citing McDonnell v. Ford Motor Co., 643 A.2d at 1105-06); see also Limmer v. Country Belle Cooperative Farmers Corp., 220 Pa. Super. 171, 286 A.2d 669, 670 (Pa. Super. Ct. 1971).

An evidentiary hearing was held over the consecutive two-day period of June 19 and June 20, 2014. Based on a review of the record, and after carefully weighing the evidence and determining the credibility of the testimony presented at the hearing, the Court finds that an enforceable settlement agreement was reached on August 30, 2013, the terms of which were subsequently memorialized by further mutual participation and agreement on January 29, 2014.

This Court's Mediation Program, as set forth in W.PA.LBR 9019-2 through W.PA.LBR 9019-7, is designed to facilitate and promote the amicable resolution of disputes.  The record reflects that the parties voluntarily participated in the Court's Mediation Program and the parties voluntarily requested to have their disputes mediated by Norman Gilkey, Esq., an experienced member of this Court's Mediation Panel.

On August 30, 2013, representatives of the Petitioning Creditors and BG Petroleum, LLC, with full settlement authority and the presence of respective counsel, participated in an eight (8) hour mediation session at Mr. Gilkey's Pittsburgh law office.  At the conclusion of the mediation session, Mr. Gilkey prepared the Mediated Term Sheet summarized above in this Memorandum Opinion.

The Mediated Term Sheet was signed by the parties and witnessed by their attorneys. On September 5, 2013, Norman Gilkey filed a "Mediator's Certificate of Completion of Mediators Conference," congratulating the parties for having reached a settlement and reporting that the Mediated Term Sheet "will form the basis of a further settlement document and a related Motion which the parties will file, presumably within the next thirty (30) days, for the consideration of this Honorable Court."

The Mediated Settlement Agreement is an enforceable agreement, subject to the strictures of Fed.R Bankr.P. 9019.  Under Pennsylvania law, "If parties

agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'") <u>Johnston v. Johnston</u>, 346 Pa. Super. 427, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985) (citations omitted).

Pursuant to the Mediated Settlement Agreement, the Petitioning Creditors and BG Petroleum, LLC have agreed to transform their relationship from Landlords-Tenant (under the Ground Lease) to one of Sellers-Buyers. While the terms of the Mediated Term Sheet speak for themselves, the gist of the transaction involves BG Petroleum, LLC's three-phased purchase of assets from the Petitioning Creditors for the total price of $14,500,000. First, BG Petroleum, LLC is acquiring specified assets by payment of $3,000,000 within one hundred twenty (120) days of this Court's approval of the Settlement Agreement, with an option to purchase extensions of time and a per diem discount for early closing. Second, BG Petroleum, LLC is acquiring additional assets by payment of an additional $3,000,000 within one (1) year of this Court's approval of the Settlement Agreement, with an option to purchase extensions of time and a per diem discount for early closing. Third, after paying $6,000,000, BG Petroleum, LLC is to execute a commercial Note in favor of the Petitioning Creditors in the amount of $8,500,000 with a 10 year maturity.

It is true that on November 7, 2013, the Petitioning Creditors' filed a *Motion*

to Approve Compromise under Rule 9019 (the *"November 2013 Settlement Motion"*).[2] During a December 19, 2013 Hearing on the *November 2013 Settlement Motion*, the Court learned that the parties disagreed with respect to how the $8,500,000 Note was to be repaid.  BG Petroleum, LLC's counsel argued that the Note would be paid as interest only with a balloon payment at the end, while the Petitioning Creditors' counsel argued that the payment would be amortized. BG Petroleum, LLC's counsel and the Petitioning Creditors' counsel testified that they, and their respective clients, would continue to negotiate, and they further agreed that any unresolved matters related to settlement could be addressed at a subsequent hearing.  On oral motion, Petitioning Creditors' counsel withdrew its *November 2013 Settlement Motion.*

Fortunately, this Court need not resolve any ambiguity with respect to the repayment of the Note, because weight of the evidence is that the parties did so

---

[2] The Court notes that the Petitioning Creditors represented to this Court that the parties, "through their respective counsel, thoroughly evaluated their respective positions, and obtained, from counsel, opinions as to the merit, or lack thereof, of the various positions being advanced, and the likelihood of success, or lack thereof, if the matter proceeded to trial on the respective issues." And "after consultation with their respective counsel and after reviewing the assessment of each as to the merits (or lack thereof) of the underlying claim(s), as well as the prospect of prevailing in the pending dispute,  conferred to determine whether the matter(s) could be amicably resolved, and, after considering the merits of the claim(s) (in the opinion of each party); the time and expense of litigation; the inherent uncertainties of litigation; the complexities of the case; the effect of an adverse decision on each party; the costs incurred to date and that would be incurred in the trial of the matter and any resulting appeals; and the delays that continued litigation could have on the administration and distribution of the estate, **agreed, subject to the approval of the Court, to a settlement of the case** as set forth infra.  (*November 2013 Settlement Motion* at p. 2) (emphasis added) (Doc. No. 92).

themselves on January 29, 2014, when authorized representatives of the

Petitioning Creditors and BG Petroleum, LLC, with the presence of their respective

counsel, met at the Johnstown law office of the Petitioning Creditors' counsel,

James R. Walsh, Esq. ("Mr. Walsh").

On January 29, 2014, the parties met with the intention of resolving their

differences as to the repayment terms on the $8,500,000 Note.[3] The parties'

mutual agreement was then memorialized within in a document drafted by Mr.

Walsh, with input from all parties, as a motion (the "*January 2014 Motion*"). (Trial

Exhibit F, 6/19 Hearing Transcript, pp. 36-38).[4]  The January 2014 Motion,

appended hereto as "Appendix B", states:

> (xii)    … Commercial Note … in the amount of $8,500,000 **with
> interest to accrue from the date of closing at the rate of
> 4.25% simple interest per annum, with interest only
> monthly payments to commence the month following
> closing** …

(*January 2014 Motion*, p. 7; Trial Exhibit F) (emphasis added).

The terms of the agreement as set forth in the *January 2014 Motion* evidence

the agreement between the parties. *As such,* there are no lingering ambiguities

with respect to incorporating the Mediated Term Sheet into a formal document for

---

[3] This finding is consistent with, the *Petitioning Creditors' Response Brief* where the Petitioning
Creditors admitted "the parties met in an attempt to work out their mutual differences on January 29,
2014 and entered into a term sheet which did address the applicable interest rate and terms of the
repayment of the $8,500,000 to be financed over time by Landlords." (Doc. No. 413, p. 8).

[4] This finding is also consistent with, the *Petitioning Creditors' Response Brief* where the Petitioning
Creditors admitted that the "…**Motion that was agreed to by the parties on January 29, 2014** …"
*Id*. (emphasis added).

Court approval.[5]

The Court finds that, having fashioned and titled the January 2014 Motion as an "Expedited Joint Motion of Movants and Debtor To Approve Settlement and Compromise of Disputed Claims Against Respondents Pursuant to Bankruptcy Rules of Civil Procedure 9019," the parties intended to present the January 2014 Agreement to the Court for approval.[6]

The Court would also note that in their *January 2014 Motion*, the parties agree that the settlement satisfies the applicable criteria for this Court's approval pursuant to Bankruptcy Rule 9019(a), citing: Protective Comm. v. Anderson, 390 U.S. 414 (1968), Morane v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996), Cameron & Mittleman v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159 (3d Cir. 2002), In re W.T. Grant Co., 699 F.2d 599 (2d Cir. 1983), and Neshaminy Office Bldg. Asso., 62 B.R. 798 (E.D. Pa. 1986).  (January 2014 Motion, p. 11; Trial

---

[5] The Court notes that the *January 2014 Motion* resolves any  issues of the applicable interest rate on the Note and the applicable property schedules associated with the transaction, which in response to the Petitioning Creditors' *November 2013 Settlement Motion*, were characterized by BG Petroleum, LLC as "simple transcription or math errors." [Doc. No. 121, ¶ 5].  The annual interest rate on the Note is 4.25% and the applicable scheduled properties are incorporated into the *January 2014 Motion.*

[6] To find otherwise would entail that either, or both, of the parties were negotiating in bad faith, deliberately violating the Local Rules of this Court and abusing the Mediation Program.  With that said, the Court is troubled by the facts that: a mediated agreement was reached on August 30, 2013, the agreement was not transformed into a mutually acceptable motion until January 29, 2014, said motion was not filed, and the mediated agreement was presented to this Court ultimately by way of a Motion to Enforce filed on June 9, 2014.  This Memorandum Opinion is not to be construed as setting a precedential relaxation of the otherwise sanctionable deviation from the twenty-one (21) day requirement set forth in W.PA.LBR 9019-6(b).

Exhibit F).

Based on a review of the record, and after carefully weighing the evidence and determining the credibility of the testimony presented at the hearings on this matter, the Court preliminarily agrees that approval of January 2014 Motion appears to warranted.  However, "[e]ven if a settlement is fair and equitable to the parties to the settlement, approval is not appropriate if the rights of others who are not parties to the settlement will be unduly prejudiced." In re Devon Capital Mgmt., Inc., 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001).

The Court therefore agrees with BG Petroleum, LLC that "Obviously, to get approval of a settlement, all parties in interest would need to be provided with notice." (BG Petroleum, LLC's Post-Trial Brief, p. 12, Doc. No. 375).  Accordingly, the Court will enter an Order to be served on all interested parties that states that the settlement has been preliminarily approved by the Court.[7]  The Order shall also provide the other interested parties (i.e., the creditors who are not parties to the settlement agreement) notice of, and an opportunity to object to, the settlement agreement.  The Order to be entered by the Court shall further provide

---

[7] In exercising its discretion regarding approval of a settlement under the factors established in In re Martin, 91 F.3d 389 (3d Cir. 1996), the Court "need only conclude that the settlement falls withing the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." In re Nortel Networks, Inc., 522 B.R. 491 (Bankr. D. Del. 2014)(quoting In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008).  After the canvassing the record, the Court finds that the settlement is above the lowest range of reasonableness because the settlement will allow this Debtor the opportunity to reorganize, particularly in light of the fact that the claims of the Petitioning Creditors will be abated.

that the absence of any timely written objection shall result in the settlement
agreement being deemed finally approved as of the passing of the objection
deadline.  If any objections to the agreement are filed by any non-party to the
agreement, a hearing will be scheduled to address the objections, and the Court
will determine whether approval of the settlement is finally affected.[8]  The Order
will also provide that the computation of time for the performance of obligations
under the settlement agreement that are triggered by Court approval shall be
tolled until the Order of the Court approving the settlement becomes final.

### III.

Even though the Court finds that the parties reached a settlement
agreement, the Petitioning Creditors nonetheless argue that any such agreement
was repudiated by BG Petroleum, LLC due to BG Petroleum, LLC's failure to
provide adequate assurance of performance. (Petitioning Creditor's Post-trial
Response Brief, Part III, Doc. No. 413).

In essence, the Petitioning Creditors claim that they did a 'Jerry McGuire'
and demanded that BG Petroleum, LLC "show them the money" and that BG
Petroleum, LLC anticipatorily repudiated the transaction by failing to timely do so.
(Petitioning Creditor's Post-trial Response Brief, Part III, Doc. No. 413).

The  Court,  however,  is  not  persuaded  by  the  Petitioning  Creditors

---

[8] In the event that an objection is filed, the Court will conduct a *de novo* hearing in
consideration of the factors of In re Martin, 91 F.3d 389 (3d Cir. 1996).

arguments.  Unfortunately for the Petitioning Creditors, the Court concludes that

the delays in completing the transactions at issue are due in large part, if not

entirely, to the Petitioning Creditors' failure to acknowledge the obvious settlement

in the first instance.  In addition, based on the evidence and testimony presented

at the evidentiary hearings, this Court finds that there is no credible evidence that

BG Petroleum, LLC overtly and deliberately communicated any repudiation of the

settlement agreement.  Moreover, for the reasons set forth below, the Court finds

that there were no reasonable grounds for the Petitioning Creditors to make a

demand of adequate performance on BG Petroleum, LLC under the unique

circumstances of this case.

As an initial matter, the Court interprets the Petitioning Creditors' reliance

on the case of Jackson v Richards 5 & 10 Inc., 289 Pa. Super. 445, 433 A.2d 888

(1981) as reflecting an error in counsel's preparation of its Post-Trial Response

Brief.

The Petitioning Creditors characterize Jackson as involving a construction

contract involving specified "stages" of performance. (Petitioning Creditor's Post-

trial Response Brief, pp. 12 and 13, Doc. No. 413).  Petitioning Creditors argue

that Jackson addressed an issue of "adequate assurance of performance" with

respect to "Stage II" of the construction contract based on issues arising during

"Stage I".  Id.  However, Jackson actually involved a contract for the purchase of

a business.  As a relevant distinction from the matter *sub judice*, the contract in

Jackson contained specific provisions [6(b) and 8(c)], requiring one of the parties [the appellant] to perform certain obligations by a specific date [March 3, 1975] and to show evidence of performance to appellee's attorney. Jackson, 289 Pa. Super. at 448.

Distinguishable from the facts in Jackson, the settlement agreement *sub judice*, by the deliberate choice of the parties to the agreement, provides that a number of BG Petroleum, LLC's key performance obligations would commence upon Court approval of the agreement. Moreover, the parties agreed that the settlement agreement itself would not take effect until an order approving the agreement became a final order of Court. The Petitioning Creditors' reliance on Jackson actually therefore undermines their argument, rather than supports it.

The Petitioning Creditors also rely on Jonnet Dev. Corp. v. Dietrich Indus., Inc. ("Jonnet"), 316 Pa. Super. 533, 463 A.2d 1026 (Pa. Super. Ct. 1983) in support of their claim that BG Petroleum, LLC repudiated the settlement agreement. (Petitioning Creditor's Post-trial Response Brief, p. 14, Doc. No. 413).

Jonnet involved a written lease agreement between Jonnet Development Corporation ("Jonnet") as the lessor, and Dietrich Industries, Inc., ("Dietrich") as the lessee. Jonnet, 316 Pa. Super. at 536. After vacating the premises and continuing to make regular monthly rental payments Dietrich sought release from its rental obligations, alleging Jonnet's anticipatory repudiation of the lease agreement. Id. Dietrich claimed that Jonnet anticipatorily repudiated the lease

by renting space for which Dietrich held a rental option under the Lease. Id. at

542.  After finding that Dietrich failed to satisfy a condition precedent (failed to

exercise a rental option under the terms of the lease), the Jonnet court determined

that it was unnecessary to determine whether Jonnet committed a repudiatory

act. Id. at 545.  As relevant to the matter *sub judice*, the court in Jonnet

nevertheless considered whether pursuant to Section 251 of the Restatement of

Contracts, Dietrich had "reasonable grounds . . . to believe that Jonnet would

commit a breach by non-performance and could therefore demand adequate

assurance of due performance from Jonnet and, if reasonable, suspend its own

performance until it received such assurance." Id. According to the court in

Jonnet, "in accordance with Comment c to Section 251 we conclude that Dietrich

could not have requested assurances of performance under Section 251 because

it lacked 'reasonable grounds' for believing that Jonnet would repudiate the rental

option." Id.

> Comment c to Section 251 of the Restatement explains that:
>
> [w]hether 'reasonable grounds' have arisen for an obligee's belief that
> there will be a breach must be determined in the light of all the
> circumstances of the particular case. **The grounds for [the obligee's]
> belief must have arisen after the time when the contract was
> made and cannot be based on facts known to [the obligee] at that
> time**. Nor, since the grounds must be reasonable, can they be based
> on events that occurred after that time [when the contract was made]
> but as to which **[the obligee] took the risk when [the obligee] made
> the contract**.

(Emphasis added.) Accord, J. Murray, Murray on Contracts § 178 at p. 351.

The Jonnet court ultimately concluded that "[g]iven the circumstances known to Dietrich when it entered into the rental option with Jonnet (i.e., that most of the space was already leased), it was apparent that if Dietrich had grounds for suspecting Jonnet's inability to satisfy its rental option obligations, such grounds arose before the parties contracted for the option and consequently failed to qualify under Comment c to Section 251 as 'reasonable grounds' which would permit suspension of Dietrich's duty to perform (i.e. exercise the rental option). Jonnet, 316 Pa. Super. at 546.

As to the matter *sub judice*, the Court finds it to be an indisputable fact that the Petitioning Creditors had concerns about BG Petroleum, LLC's willingness and/or ability to pay taxes and rental obligations and other operational expenses from at least the time of the filing of the involuntary petition. The ground for the Petitioning Credtors' concerns, by their own admission, arose prior to the settlement agreement. Moreover, the list of concerns raised by the Petitioning Creditors in reference to matters post-dating the settlement agreement are of the same types of concerns which they knew prior to the settlement agreement. Based on the evidence and testimony presented at the evidentiary hearings and based on the record in this case, including the context of the parties' history, this Court finds that the Petitioning Creditors knowingly or otherwise assumed or took these risks when making the contract (agreeing to the settlement) with BG Petroleum, LLC. As such, demanding adequate assurance was not appropriate

under the circumstances in light of the holding(s) in <u>Jonnet</u>.

The Court finds, therefore, that BG Petroleum, LLC did not repudiate the settlement agreement. The parties engaged in extensive negotiations with the active assistance of counsel in order to establish which specific obligations were released or abated, and which obligations remain in place under the terms of the settlement agreement. Whether BG Petroleum, LLC satisfies the contractual duties negotiated by the parties will be known if and after those performance obligations are triggered by the final approval of the settlement agreement by this Court.

## IV.

In addition to throwing up roadblocks to its settlement, the Petitioning Creditors went on the offensive in this bankruptcy case and filed a preemptive Motion for Relief From Stay seeking a determination that the Ground Lease had been terminated prior to the commencement of the involuntary bankruptcy case. The timing of the motion is certainly interesting as it was the Petitioning Creditors who invoked the automatic stay by instituting this bankruptcy case in the first instance, and now they apparently do not like the fact that their rights under the Ground Lease may be stayed.

In any event, the Court considered evidence and heard testimony that the Petitioning Creditors notified BG Petroleum, LLC of alleged defaults under the Ground Lease, including a letter dated January 22, 2013. This letter of January

22, 2013 could conceivably be construed as establishing the Petitioning Creditors' intent to the terminate the Ground Lease.

The Court also considered evidence and heard testimony that BG Petroleum, LLC contested the alleged defaults and that the Ground Lease was never formally terminated.

Examining the weight of the evidence of the conduct of the parties subsequent to the letter of January 22, 2013, the Court finds no evidence that the Petitioning Creditors took formal action to take possession of Ground Lease assets, whether through eviction or ejection. Moreover, the Petitioning Creditors, with the active involvement of their authorized principals and the active assistance of able counsel, included the Ground Lease and its assets among the terms of settlement included in the August 30, 2013 Mediated Term Sheet. Significantly, the Mediated Term Sheet provides:

> 9.　Within thirty (30) days of Bankruptcy Court approval of settlement, BG Petroleum, LLC and the landlord's representatives shall negotiate, execute and place into escrow the following:
>> A.　A Consent Order for Dismissal of the Chapter 11;
>> B.　A Consent Order for Relief from the Automatic Stay in favor of the **landlord's** representatives; and,
>> C.　**A Consensual surrender/termination of the May 1, 2012 Ground Lease and an Award of possession to the landlord or its representatives**.

<u>See</u> (Mediated Term Sheet, Trial Exhibit C) (emphasis added).

In fact, the relationship between the Petitioning Creditors and BG Petroleum, LLC was characterized throughout the Mediated Term Sheet as a Landlord-Tenant relationship.  This representation persisted and was manifest in the January 2014 Motion as drafted by counsel for the Petitioning Creditors, with the active participation of the Petitioning Creditors' authorized principals. Significantly, the January 2014 Motion provides:

(xiii)   Within thirty (30) days of Bankruptcy Court approval of this Settlement, BG Petroleum, LLC and **Landlord's Representatives** shall negotiate, execute and deliver to the Escrow Agent, who shall be Norman Gilkey, Esquire, for placement into Escrow, the following documents:

(a)   A Consent Order For The Dismissal of BG Petroleum, LLC's Chapter 11 Case;

(b)   A Consent Order For Relief From The Automatic Stay in favor of **Landlord** and its Representatives; and

(c)   **A consensual surrender/termination of the May 1, 2012 Ground Lease and an award of possession to the Landlord or, as the case may be, its representatives**.

Upon the filing of an Affidavit Of Default on the part of BG Petroleum, LLC of any of the terms and conditions of this Settlement Agreement, addressed to the Escrow Agent and BG Petroleum, LLC, its principals and its counsel, and the failure of BG Petroleum, LLC to have cured the default within twenty (20) days of the date of the Notice, the Escrow Agent shall release to and deliver to **Landlord** or, as directed, its representatives, the above referred to documents and **Landlord**, or its representatives, as the case may be, shall be free to enforce the same as permitted by law;

(xiv)   **The parties agree that BG Petroleum, LLC, in accord with the authority accorded it under the Ground Lease of May 1, 2012**, and under this Settlement Agreement, shall at its expense, have the irrevocable right, at any time, to elect to file Chapter 11 and/or Chapter 7 bankruptcy cases for Bedford

00014919
-33-

County Oil Company, Inc., and Sunco Enterprises, Inc. , at any time after the passage of one (1) year from the date of Closing on the acquisition of the personal property of Bedford County Oil Company, Simmons and/or Sunco, and **Landlord** and **Landlord's** representatives shall fully and promptly cooperate with BG Petroleum, LLC's efforts in doing so. **It is further agreed that all past due rents due the Landlord (Owners and Sellers herein) by BG Petroleum, LLC under the Ground Lease of May 1, 2012 and all additional monthly rents coming due under the Ground Lease are abated during the remainder of the term thereof**.

(xv)    The parties agree that BG Petroleum, LLC shall reaffirm and remain in compliance from the date of the approval of this Settlement Agreement with all disclosure and reporting requirements, financial and otherwise, **as provided for under the Ground Lease,** applicable franchise agreements, or other applicable documents, including, upon the closing of the A-1 property, the reporting and disclosure requirements of the Note, Mortgage and Security Agreement;

See (January 2014 Motion, Trial Exhibit F) (emphasis added).

This language suggests that the parties understood that the Ground Lease was not terminated. Regardless, for the reasons set forth in Part II of this Memorandum Opinion, above, the Court finds that the parties reached a settlement agreement. While the terms of that settlement agreement speak for themselves, the Court is mindful of the fact that the parties essentially agreed to the Petitioning Creditors selling specified assets to BG Petroleum, LLC for the total purchase price of $14,500,000, including the assets that are subject to the Ground Lease. That agreement also provides that specified claims between the parties are released and/or abated. As noted above, section (xiii) of the agreement also provides that, in the event of BG Petroleum, LLC's default, BG Petroleum, LLC

consents to an Order for Relief from the Automatic Stay in the Petitioning Creditors' favor, and that BG Petroleum, LLC will consensually surrender/terminate the Ground Lease and award possession to the Petitioning Creditors. Given this agreement, the Petitioning Creditors are estopped from taking a contrary position at the present moment. See In re Turner, 274 B.R. 675 (Bankr. W.D. Pa. 2002); see also In re Lyons Transp. Lines, Inc., 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994).

Moreover, from a relief from stay perspective, 11 U.S.C. § 362(d)(2) permits a bankruptcy court to lift or annul the stay for "cause" shown.  The use of the word "cause" in this statute is undefined, thereby leaving it up to the Court's discretion as to whether the circumstances warrant the *vacatur* of the stay.

In canvassing the totality of the circumstances to determine whether the automatic stay should be lifted, the Court considered many factors, including (1) any prejudice that would be suffered by BG Petroleum, LLC or the estate if the stay were to be lifted and (2) the balance of hardships between the parties.[9]  In re Peregrine Systems, Inc., 314 B.R. 31, 47 (Bankr. D. Del. 2004), aff'd in part, rev'd in part on other grounds, 2005 WL 2401955 (D. Del. Sept. 29, 2005).  Each of these factors support keeping the stay in place.  As to prejudice to BG Petroleum,

---

[9] A third factor considered by the courts in some cases is the "probablity of success on the merits."  As this Court concludes that BG Petroleum, LLC and the Petitioning Creditors have entered into a settlement agreement, this factor is either not applicable or can be deemed to have been satisfied.

LLC, there is a settlement agreement in place that enables BG Petroleum, LLC to acquire the Ground Lease assets.  Lifting the stay at this juncture does nothing but take that opportunity away and rewards the Petitioning Creditors for throwing roadblocks in the way of consummating the settlement agreement.  As to the balance of hardships, no cognizable hardship befalls the parties by keeping the stay in place as the status quo is maintained.    Each of these circumstances therefore supports the denial of the Motion for Relief From Stay.

Of course, the Court is mindful that the settlement agreement itself contains terms and conditions upon which the stay can be lifted in favor of the Petitioning Creditors if BG Petroleum, LLC subsequently defaults under the terms of the settlement agreement.  For this reason, the denial of the Petitioning Creditors' Motion for Relief from the Automatic Stay shall be without prejudice.

**V.**

The dueling Motions in this case include a request by the Petitioning Creditors for the appointment of a Chapter 11 Trustee pursuant to 11 U.S.C. §1104. This section of the Bankruptcy Code provides, in relevant part, as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . . and after notice and a hearing, the court shall order the appointment of a trustee –
>> (1) For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . .; or

> (2)    If such appointment is in the interest of creditors,
> any equity security holders, and other interests of
> the estate. . . .

11 U.S.C. §1104(a).

Decisions regarding the appointment of a Chapter 11 trustee "must be made on a case-by-case basis." In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989). "The party moving for appointment of a trustee . . . must prove the need for a trustee under either subsection by clear and convincing evidence." Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313, 317-18 (3d Cir. 2004) (citing In re Marvel Entertainment Group, Inc., 140 F.3d 463, 473 (3d Cir. 1998) and In re Sharon Steel, 871 F.2d at 1226).

In addition, appointing "a trustee in a Chapter 11 case is an 'extraordinary' remedy, and there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession." The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3d Cir. 2003); see also In re Insilco Technologies, Inc., 480 F.3d 212, 215 n.3 (3d Cir. 2007) (noting that "the default rule is that the debtor remains in control of the bankruptcy estate and operates its business as 'debtor in possession'"); In re Marvel Entertainment Group, Inc., 140 F.3d 463, 471 ("It is settled that the appointment of a trustee should be the exception, rather than the rule.") (quoting In re Sharon Steel, 871 F.2d at 1225); Community Bank v. Five Rivers Petroleum, LLC (In re Five Rivers Petroleum), No. 11-25202, 2013 WL 656026, *8, 2013 Bankr. LEXIS

678, *23 (Bankr. W.D. Pa. Feb. 22, 2013) ("[t]he appointment of a [t]rustee in a [c]hapter 11 case is an extraordinary remedy which should not be granted lightly, as it may impose a substantial financial burden on a hard-pressed debtor seeking relief under the Bankruptcy Code.")(quoting In re Sharon Steel Corp., 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988)).

In support for their Motion to Appoint a Chapter 11 Trustee, the Petitioning Creditors rely heavily on claims related to BG Petroleum, LLC's failure to satisfy its obligations under the May 2012 Ground Lease.  Indeed, almost all of those claims are recited verbatim in the Petitioning Creditors' Motion for Relief From the Automatic Stay, which was addressed in Part IV of this Memorandum Opinion, above.

As explained in Part IV, above, this Court finds that the Ground Lease was the subject of a settlement between the parties.  Likewise, BG Petroleum, LLC's obligations with respect to payment of taxes, rent, third party vendors, and operating expenses were addressed by mutual agreement and manifest in the January 2014 Motion.

In addition, the Court is not persuaded by the Petitioning Creditors' claim that there is a level of acrimony between the parties sufficient to give rise to "cause" for an appointment of a Chapter 11 Trustee. (Petitioning Creditors' Post-Trial Brief pp. 4-6, Doc. No. 401) (citing In Re Marvel Entertainment Group, 140 F.2d 463 (3rd. Cir. 1998) In re Cajun Elec. Power Coop., Inc., 74 F.3d 599 (5th

Cir. 1996).   In the case *sub judice*, the parties reached a mutual settlement agreement, as set forth in detail in Part II of this Memorandum Opinion, above. To the extent that there is any post-settlement-agreement-acrimony, the Court finds that the Petitioning Creditors' failure to comply with the W.PA.LBP 9019-6(b) is the primary cause of any remaining acrimony. Those issues are now moot. Upon the settlement agreement being approved on a final basis, the Petitioning Creditors will have a contractual remedy, by their own design, to address any lingering acrimony.   No trustee is warranted under these circumstances as the Petitioning Creditors are more than sophisticated enough to protect their own interests.

The Court is also not persuaded by the Petitioning Creditors' implication that BG Petroleum, LLC's principals are fairly characterized as "[m]en in desperate situations ... predisposed to 'do desperate things' that "are dishonest in nature and very troublesome." (Petitioning Creditors' Post-Trial Brief pp. 4-6, Doc. No. 401) (citing In Re LaSherene, Inc., 3 B.R. 169, 175 (Bankr. N.D. Ga. 1980).

There is no doubt that BG Petroleum, LLC faces financial problems, and the future of BG Petroleum, LLC will depend on the ability of BG Petroleum, LLC to consummate the transactions set forth in the settlement documents.

The Court is nonetheless concerned by three specific allegations raised by the Petitioning Creditors.   First, the Petitioning Creditors allege that BG Petroleum, LLC made substantial payments to an affiliated entity operating as "BG

Energy." (Petitioning Creditors' Post-Trial Brief at ¶ 23, Doc. No. 401). The Court

cautiously finds that the balance of evidence and credible testimony presented at

the evidentiary hearing supports BG Petroleum, LLC's representation that it was

pursuing a joint venture with BG Energy to the benefit of BG Petroleum, LLC.

(6/20 Hearing Transcript, pp. 58-61, Doc. No. 337).

Second, the Petitioning Creditors allege that:

> lease payments for the leasing of convenience stores owned by
> Landlord to third parties were going to and being deposited into
> accounts of Tri-Star Petro, LLC, an entity created by and controlled
> by Attilio DeMarco, and were not being deposited into the accounts
> of the Landlord owner and used for the payment of the obligations
> arising from the operations of the businesses of Bedford County Oil
> Company, Simmons and/or Sunco.

(Petitioning Creditors' Motion for Appointment of Chapter 11 Trustee, ¶ 23; Doc.

No. 194).

The Court cautiously finds that the balance of evidence and credible

testimony presented at the evidentiary hearing supports BG Petroleum, LLC's

representation that it was pursuing a venture with Tri Star Petro to the benefit of

BG Petroleum, LLC, and therefore insufficient evidence has been presented upon

which the Court could conclude that the transactions were tainted with

dishonesty, fraud or breach of fiduciary duty as suggested by the Petitioning

Creditors.

Third, the Petitioning Creditors allege that one of BG Petroleum, LLC's

principals (Mr. Dever) used thousands of dollars of funds of Bedford County Oil

Company, Simmons and/or Sunco, for the payment of his spouse's medical expenses and to pay his personal expenses incurred at various department stores, jewelry stores and entertainment venues.  (6/20 Hearing Transcript, pp. 85-87, Ex. 20, Doc. No. 337).  The Court cautiously finds credible Dever's testimony that the personal advances and payments of personal expenses (other than his spouse's medical expenses) had been repaid.  Id.  In so finding, the Court concludes that these discrete items do not warrant the present appointment of a trustee (as the cost of appointing a trustee could very outweigh the benefits of appointing one at this stage of the case).  The Court, however, cautions the parties that if further questionable expenditures are made the Court may appoint a trustee in the future.  As such, denial of the Motion to Appoint Trustee is without prejudice.

The Court further notes that the settlement agreement contains various financial reporting requirements of the debtor-in-possession to the Petitioning Creditors.    These reporting requirements are in addition to the reporting requirements set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure upon BG Petroleum, LLC.

Given all the reporting that is required, and given the sophistication of the parties, the Petitioning Creditors are in a constant position to observe BG Petroleum, LLC's conduct as a debtor-in-possession throughout the pendency of this case.  The Petitioning Creditors are therefore well positioned to bring any

improper conduct of BG Petroleum, LLC or its managers to this Court's attention.

To be clear, the estate's fiduciaries will held to the exacting standard required under applicable law. The Court reaches this conclusion because "[i]f a debtor remains in possession -- that is, if a trustee is not appointed -- the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) (citing Wolf v. Weinstein, 372 U.S. 633, 649-52 (1963)).

Accordingly, for all of the foregoing reasons, the Court will enter an Order that denies the Motion for the Appointment of a Chapter 11 Trustee without prejudice.

*[Remainder of Page Intentionally Left Blank]*

## VI.

This Memorandum Opinion constitutes the Court's finding of facts and conclusions of law pursuant to Fed.R.Bankr.P. 7052.  For the reasons set forth above, the Court shall enter an order that grants the Motion to Enforce Settlement filed by BG Petroleum, LLC, and that denies (without prejudice) the Motion for Relief From Stay and the Motion to Appoint Trustee filed by the Simmons Group.

Date: February 13, 2015

Jeffery A. Deller
Chief U.S. Bankruptcy Judge

cc:   Office of the U.S. Trustee

John Lacher, Esq. and Robert O Lampl, Esq.
  counsel to BG Petroleum, LLC

Kevin Petak, Esq. and James Walsh, Esq.,
  counsel to the Petitioning Creditors

FILED
2/13/15 3:06 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

00014919

-43-

1 Ce: BG                          (8/30/13)

Settlement Term Sheet  8/30/13

1. Purchase price is $14.5 Million
for A-1, A-2 and A-3 properties.

                    minimum of
2 Payable  $3 Million within 120 days
After Bankruptcy Court approves settlement.
BG Petroleum, LLC ("BGP") may
purchase two thirty (30) day extensions
at $25,000 for the first and $37,500
for the second extension, such fees
not a credit toward the purchase
price.
                    minimum of
3. For the  $3 Million purchase price.
BGP or its designee may acquire
A-2 or A-3 parcels up to that value
per schedule Agreed upon by parties -
being Exhibit A Term Sheet of June 13, 2013

4. Remaining balance of $3 Million or
less, as applicable, payable within one
year After Bankruptcy Court approves
settlement. BGP may purchase extensions
on terms stated in No. 3. Upon payment of
this portion of purchase price, BGP or its
designee to receive title to Remaining
A-2 and A-3 properties.

**Appendix A**

(2)

5. All properties to be conveyed via good and marketable title, insurable at standard rates. BGP responsible for paying real estate taxes.

6. Full cooperation from landlord's representatives incident to referring prospective tenants to BGP.

7. Counsel for BGP and landlord's representatives to determine the effective date for the entry of an Order for Relief, subject to Bankruptcy Court approval.

8. When $6 million of the purchase price has been paid, BGP or its designee to receive title to the A-1 property, subject to BGP or its designee executing a Note for $8.5 Million bearing interest at 4.25% per annum, with a 10-year maturity, to be secured by a 1st mortgage on the A-1 property and a security interest in the Flying J franchise and the A-1 accounts, accounts receivable, equipment and other personal property. At

(3)

time of delivery of Deed, Landlord's representatives shall deliver a Bill of Sale for the Flying J franchise.

9. Within thirty (30) days of Bankruptcy Court approval of settlement, BGP and the Landlord's representatives shall negotiate, execute and place into escrow the following:

A. A Consent Order for Dismissal of the Chapter 11;

B. A Consent Order for Relief from the Automatic Stay in favor of the Landlord's representatives; and,

C. A consensual surrender/termination of the MAY 1, 2012 Ground Lease and an award of possession to the Landlord or its representatives.

10. With BGP shall file Chapter 7 cases, at its expense, for Bedford County Oil Company, Inc. ("BCOC") and Sunco, Inc. ("Sunco") with the cooperation of the Landlord and the Landlord's representatives.

11. Parties to reaffirm Reporting requirements.

(4)

12. To the extent one or more of the Landlord's representatives are personal guarantors of any franchises, BGP shall obtain releases of such guaranties.

13 BGP shall indemnify Landlord and Landlord's representatives from claims against BCOC, Simmons Realty Company, Inc. and Sunco.

14. BGP waives all claims, if any, pursuant to Bankruptcy Code Section 303.

15. Each party responsible for its own legal fees and costs.

16. BGP shall assume and be responsible for the Susquehanna Bank line of credit obligation.

17 BGP shall remain current and in compliance with the Flying J contract.

18. BGP shall pay any taxes due to Pennsylvania arising out of operations. BGP shall pay all Maryland and West Virginia taxes arising out of operations to the extent, if any, one or more of the Landlord's representatives has or may have personal liability.

(5)

19. Pending Bankruptcy Court approval of a settlement, BGP shall pay necessary payments to Susquehanna Bank, commencing with the payment due August 1, 2013.

20. If BGP's employment of Clint Simmons or Bob Simmons is terminated without cause prior to payment of $6 Million of the purchase price, BGP shall be deemed to have retained Clint Simmons, Bob Simmons, Tom Watters, Nyle Mellott and Loretta Simmons as consultants at a rate of $1,000.00 per week, per individual until the $6 Million has been paid.

21. BE Upon Bankruptcy Court approval of the settlement, All parties, including Landlord's representatives, shall be deemed to have released Any and All claims that All or Any of them had against Another party, including Landlord's representatives, or Tenant's representatives, which Arose from the beginning of time through the date hereof, except for obligations preserved or Arising under this settlement.

Agreed to August 30, 2013, in Pittsburgh, Pennsylvania.

_____          _____
Robert K. Simmons

B G Petroleum, LLC,              Bedford County Oil
by Breezewood                    Company, Inc.,
Venture, LLC, by                 Simmons Realty
Attilio J. DeMarco,              Company, Inc. and
Managing Member.                 Sunco Enterprises,
                                 Inc., by Robert K.
_____          Simmons, an officer
William J. Miller

                                 _____
_____          Clinton D Simmons,
Gerald P. Dever                  for himself and
                                 Loretta Simmons

_____          _____
Attilio J. DeMarco               Robert K. Simmons,
                                 for himself and
                                 Thomas Watters

                                 _____
                                 Nyle Mellott

IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

*********************************************************************

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
| BG PETROLEUM, LLC | )    Bktcy. 13- 70334 JAD |
|  | )    Chapter 11 |
| Debtor | ) |

*********************************************************************

|  |  |
|---|---|
|  | )    Doc. # |
| CLINTON D. SIMMONS; ROBERT K. SIMMONS; | ) |
| LORETTA M. SIMMONS; NYLE MELLOT; JOAN | ) |
| MELLOT; THOMAS WATERS; LADONNA WATERS; | ) |
| BEDFORD COUNTY OIL COMPANY, INC.; | ) |
| SIMMONS REALTY COMPANY, INC.; SUNCO | ) |
| ENTERPRISES, INC. | ) |
|  | )    Hearing Date: |
|  | ) |
|  | )    Time: |
|  | ) |
| Movants | ) |
| v. | )    Related To Doc. |
|  | ) |
| BG PETROLEUM, LLC | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| Respondent | ) |

*********************************************************************

**EXPEDITED JOINT MOTION OF MOVANTS AND DEBTOR TO APPROVE SETTLEMENT AND COMPROMISING OF DISPUTED CLAIMS AGAINST RESPONDENTS PURSUANT TO BKKCY. R.C.P. RULE 9019**

COMES NOW JOINTLY, the Movants above named, by and through their counsel, James R. Walsh, Esquire and Spence, Custer, Saylor, Wolfe & Rose, LLC, and the Debtor above named, by and through its counsel, John Lacher, Esquire; Robert O. Lampl, Esquire; David Fuchs, Esquire and the Law offices of Robert O. Lampl do collectively file the within Joint Motion Of Movants And Debtor To Approve Settlement And Compromising of Disputed Claims Against Respondents Pursuant To Bktcy. R.C.P. Rule 9019, upon a cause whereof the following is a statement, to wit:

1

**Appendix B**

1. Several of the Movants, to wit, Nyle and Joan Mellott, Robert K. Simmons, Clinton D. Simmons, Loretta M. Simmons, Thomas, Waters, and Ladonna Waters, commenced the within case by filing an involuntary petition for re lief pursuant to Chapter 11 of Title 11 of the U.S. Code, ii U.S.C. Section 101, et seq, on May 3, 2013.

2. The instant matter is a "core proceeding" over which this Court has jurisdiction pursuant to 11 U.S.C. Sections 157 and 1334.

3. Subsequently, on May 21, 2013, Movants Bedford County Oil Company, Simmons Realty Company, Inc.; and Sunco Enterprises, Inc. joined in as petitioning creditors.

4. The alleged Debtor, BG Petroleum, LLC is represented by Robert O. Lampl, Esquire; John Lacher, Esquire; and David Fuchs, Esquire, all in association with the Law Offices of Robert O. Lampl, and all with a business address of 960 Penn Ave., Suite 1200, Pittsburgh, Pa., 15222.

5. The alleged Debtor, filed a Motion To Dismiss The Instant Proceeding, the provisions thereof being incorporated herein by reference.

6. Movants have filed a Response to the said Motion To Dismiss In The Instant Proceeding, the provisions of said Response being incorporated herein by reference.

6. Said action remains pending at this time.

7. The Movants and Respondents, entered into Court Ordered Mediation and with and through their respective counsel and with guidance and assistance of the Mediator, thoroughly evaluated their respective positions, and obtained, from respective counsel, opinions as to the merit, or lack thereof, of the various positions being advanced, and the likelihood of success, or lack thereof, if the matter proceeded to trial on the respective issues.

8. The parties have, after consultation with their respective counsel and after reviewing the assessment of each as to the merits (or lack thereof) of the underlying claim(s), as well as the prospect of prevailing in the pending dispute, conferred to determine whether the matter(s) could be amicably resolved, and, after considering the merits of the claim(s) (in the opinion of each party); the time and expense of litigation; the inherent uncertainties of litigation; the complexities of the case; the effect of an adverse decision on each party; the costs incurred to date and that would be incurred in the trial of the matter and any resulting appeals; and the delays that continued litigation could have on the administration and distribution of the estate, agreed, subject to the approval of the Court, to a Mediated settlement of the case as set forth infra.

9. The Court Ordered Mediation had a favorable result and the

2

parties to the mediation, with the assistance of respective counsel and Norman Gilkey, the Court Appointed Mediator, reached terms of the settlement, as follows, to wit:

(i)    The Total Purchase Price to be paid by BG Petroleum, LLC ("BG" or "Purchaser") or its assignees, to the Owners (as "Sellers") for the following assets shall be Fourteen Million Five Hundred Thousand Dollars ($14,500,000.00) payable as follows: (a) Fourteen Million Four Hundred Thousand Dollars ($14,400,000.00) for all of the Individual Premises identified on Schedule(s) A-1, A-2, and A-3, a copy of Schedule A being attached hereto, incorporated herein, and referred to as Exhibit A, subject to the release of Individual Premises for and at the corresponding Individual Premises Scheduled Purchase Prices set forth in Exhibit A attached (also referred to as Schedule A), and a total of One Hundred Thousand Dollars ($100,000.00) for the following additional assets (collectively, the "Additional Assets") of the Sellers for and at the following corresponding Individual Additional Asset Purchase Prices: (b) Fifty Thousand Dollars ($50,000.00) for all assets of Bedford County Oil Company, including but not limited to, all rolling stock, all inventories, all equipment, all underground storage tanks, all multiple product dispensers (MPDs), all personal property, and all other assets of Bedford County Oil Company, Inc.; (c) Forty Thousand Dollars ($40,000.00) for all assets of Sunco Enterprises, Inc., including but not limited to, all rolling stock, all inventories, all equipment, all personal property, and all other assets of Sunco Enterprises, Inc.; and (d) Ten Thousand Dollars ($10,000.00) for all assets of Simmons Realty Company, Inc., including but not limited to, all vehicles, all equipment, all inventories, all personal property and all other assets of Simmons Realty Company, Inc. The Seller agrees to work cooperatively and in good-faith with BG to compile a complete, accurate and up to date, Schedule of all assets of each of the aforementioned three (3) Companies. The Seller shall, at the time of payment for the assets of each Company, execute and deliver to Purchaser, a Bill of Sale. For purposes of this Settlement Agreement, "the Assets" shall mean, the Building Service Equipment, and all operating assets of the Seller, including but not limited to Seller's related business records, computers, office, equipment, underground storage tanks, refrigeration and cooling equipment, rolling stock, land and improvements to the land, goodwill, trademarks, and Seller's interest in and to, (i) all supplier contracts, (ii) all assets used in petroleum sales including but not limited to all underground storage tanks (USTs), all multiple product dispensers (MPDs), all canopies, etc., (iii) any and all leaseholds, (iv) any and all Franchise Agreements, and

3

(v) all real estate property ownership, (vi) the operation of all fuel dealerships, (vi) truck stops and food facilities, and(vii) including, but not limited to, all of the assets listed on the schedule of assets attached as Exhibit B hereto (the "Assets Schedule). As part of the Assets, the Seller shall also provide to BG or its designated assignee, all cash exclusive of amounts due or paid under this Agreement, accounts receivable, and all other current assets such as employee and shareholder advances, utility deposits and prepaid expenses.

(ii)   A minimum of Three Million Dollars ($3,000,000.00) of the total purchase price of $14,500,000.00 shall be payable to Sellers within 120 days of the Bankruptcy Court's approval of this Motion, in cash, certified funds or other immediately available funds, in return for which BG Petroleum, LLC (or its assignee) shall be entitled to receive title to the Individual Premises and/or all of the Additional Assets of Bedford County Oil Company, Inc., Sunco Enterprises, Inc. and/or Simmons Realty Company, Inc. referred to infra of its selection and choice with a specified value equal to the amount paid; however, the Sellers agree to provide the Purchaser with a discount of $350.00 per day in the total purchase price of $14,500,000.00 and payment of the minimum of $3,000,000.00 of the total purchase price for each day Closing occurs in advance of 120 days of the Bankruptcy Court's approval of this Motion;

(iii)  Should BG not be prepared to or be unable to make the required $3,000,0000 payment to the  Seller for BG (or BG designated assignee)selection and purchase of a portion of the respective Individual Premises and/or Additional Assets in a timely manner, BG shall be permitted to purchase a thirty (30) day extension for the payment of said $3,000,000 by paying to said Seller(s) of said respective Individual Premises and Additional Assets, before the expiration of said 120 day period, the sum of Twenty Five Thousand Dollars ($25,000.00) within said period in which BG can exercise the purchase rights provided for in Paragraph (v) infra, and said $25,000.00 payment shall not be credited to or considered as a payment toward said $3,000,000 payment due for said Individual Premises and/or Additional Assets of BG's choice and selection;

(iv)   Should BG not be prepared to or be unable to make the required $3,000,0000 payment to the Seller for BG (or BG designated assignee)selection and purchase of a portion of the respective Individual Premises and/or Additional Assets in a timely manner within said 120 period and should BG have exercised and paid for the thirty (30) day extension

4

provided for in subparagraph (iii) supra, BG shall be
permitted to purchase one (1) additional thirty (30) day
extension for the payment of said $3,000,000 by paying to
said Seller(s) of said respective Individual Premises and/or
Additional Assets, before the expiration of said 120 day
period, and said 30 day extension (if purchased and paid
for) the additional sum of Thirty Seven Five Hundred
Thousand Dollars ($37,500.00) within said period within
which BG can exercise the purchase rights provided for in
Paragraph (v) infra, and said $37,500.00 payment shall not
be credited to or considered as a payment toward said
$3,000,000 payment due for said Individual Premises and/or
Additional Assets of BG's choice and selection;

(v)    Should BG pay to the Seller(s) of said
       Individual Premises and Additional Assets, the minimum sum
       of $3,000,000 in a timely manner as provide for in
       subparagraphs (ii), (iii), or (iv) supra, BG (or its
       designated assignee) shall be entitled to receive from the
       Seller(s) of the Individual Premises and Additional Assets
       set forth in Exhibit A-2 and/or A-3 and/or detailed herein
       such Individual Premises and/or Additional Assets as BG or
       its designated assignee shall elect up to the value paid
       toward the purchase price set forth in Schedule A-2,
       Schedule A-3 (being the term sheet of June 13, 2013) and
       hereinabove for the purchase price of Additional Assets by
       BG or its designated assignee, without credit for any
       extension payment(s) made by BG pursuant to subparagraphs
       (iii) or iv) pursuant hereto;

(vi)   BG and or its assignee shall have the right to make
       additional settlements on any Individual Premises and/or
       upon any individual Additional Asset listed hereinabove of
       BG choice and selection at any time following payment to
       Seller of the initial $3,000,000 payment, and Seller agrees
       to reasonably accommodate any such Closing(s) within ten
       (10) days advanced written notice by BG to Seller of any
       such Closing. As to the remaining A-2,and A-3 scheduled
       Individual Premises and Additional Assets  not previously
       purchased by BG and released by Seller to BG or its
       designate assignee(s)at Closing in accord herewith, the
       remaining $3,000,000 balance of the total purchase price
       relating to the remaining A-2 and A-3 properties and
       Additional Assets after receipt of the initial $3,000,000
       hereunder shall be due and fully payable to Sellers within
       not more than one (1) year from the date of the Bankruptcy
       Court's approval of this settlement. As an enticement to
       encourage BG's Investor/Lender to enable settlement and
       payment of $3,000,000 in advance of one (1) year from the
       date of approval of this Settlement Agreement by the
       Bankruptcy Court, the Seller agrees to provide a discount in

the $3,000,000 remaining payment of $350.00 for each day the
Closing and payment to Seller is advanced and occurs sooner
than the required 365-days following the date of Bankruptcy
Court approval; it being intended, in the event of closings
on less than all then remaining assets, that this discount
be prorated;

(vii) Should BG not be prepared to pay the remaining portion of
the purchase price due for the A-2 and A-3 properties and/or
the Additional Assets, BG shall be entitled to purchase up
to two (2) extensions toward the payment date of said
remaining $3,000,000 portion of the A-2, A-3 and Addition
Asset(s) purchase price upon the same terms and for the same
periods as set forth in subparagraphs (iii) and (iv) supra;

(viii) Upon payment of all or any portion of the remaining portion
of the purchase price by BG, BG or its designated assignee
shall be entitled to receive the conveyance of free and
clear and good title, insurable at standard ALTA rates
excepting easements and restrictions of record or as are
apparent from a reasonable inspection of the Premises and
liens or encumbrances created or permitted to be created by
BG, to the remaining Individual A-2, A-3 Premises and/or
Additional Assets for which corresponding payment is made to
the Seller hereunder, all in accord with the terms of the
this Settlement Agreement;

(ix) All Individual Premises listed in Exhibit A attached, and
the Individual Additional Assets listed hereinabove shall be
conveyed by Seller to BG or its designated assignee(s) with
good and marketable title, free and clear of liens and
encumbrances, excepting easements and restrictions of record
or as are apparent from a reasonable inspection of the
Premises and liens or encumbrances created or permitted to
be created by BG, and shall be insurable by a reputable
title insurance company at standard ALTA rates. BG shall be
responsible for the payment of unpaid and hereafter accruing
real estate property taxes. In the event, it is determined,
(i) title to an Individual Premises is defective, (ii) title
is not insurable at standard ALTA rates, and/or (iii) an
Individual Premises is determined to be contaminated by EPA
standards and guidelines, then and in any such event, the
Purchaser may elect to eliminate from purchase any such
Individual Premises; however, if and when, (a) the defective
title is cured, (b) the Individual Premises becomes
insurable at standard ALTA rates, and/or (c) contamination
at the Individual Premises is resolved to the full
satisfaction of the EPA, the Purchaser shall be afforded the
right and opportunity to make the purchase of any such
Individual Premises for and at the agreed upon sale and
purchase set forth in Exhibit A, attached within ninety (90)

days from the date of written notice by the Seller to the
Purchaser that all such defects or deficiencies are cured
and resolved;

(x)   Landlord and its representatives shall fully cooperate in
referring any prospective tenants of the A-2 and/or A-3
properties that may approach Landlord or its representatives
to BG;

(xi)  The parties mutually agree that an Order For Relief shall be
entered against BG in the pending Involuntary Case. Counsel
for BG and counsel for the Petitioning Creditors, who is
counsel for Landlord and its representatives, shall mutually
agree, subject to Bankruptcy Court approval, upon the date
that said Order For Relief shall be effective;

(xii) Upon the payment to Sellers of the $6,000,000 purchase price
for the A-2, A-3 Individual Premises and all Additional
Assets, and conveyances by Seller of clear and marketable
title of same to BG or its designated assignee(s), BG or its
designated assignee shall be entitled to receive title to
the entirety of the A-1 Premises, title to which shall be in
conformity with Par. (ix) supra, subject to the Grantee
executing in favor of Sellers a Commercial Note, which shall
contain the covenants and terms and conditions consistent
with such a commercial transaction, in form and substance
acceptable to Seller and Purchaser counsel, in the amount of
$8,500,000.00 with interest to accrue from the date of
closing at the rate of 4.25% simple interest per annum, with
interest only monthly payments to commence the month
following closing and the Seller hereunder agrees to make
settlement upon no less than ten (10) day prior written
notice from Purchaser to Seller of Purchaser intend to make
Closing on the A-1 Property. The Note shall have a ten (10)
year maturity (from the date which is one year from the date
of Court Approval of this Settlement Agreement), at which
time the entire balance shall become fully due and payable.
Said obligation shall be secured by a First position
Commercial Mortgage And Assignment of Rents encumbering the
A-1 Premises, which shall contain the covenants and terms
and conditions consistent with such a commercial
transaction, in form and substance acceptable to Seller and
Purchaser counsel, in the amount of $8,500,000.00, as well
as a first position Commercial Security Agreement and such
documents as may be necessary to perfect the same, securing
the Flying J (or its successor) Franchise, as well as the
accounts, accounts receivable, and all other personalty
(tangible as well as intangible) then existing or thereafter
acquired of the Grantee. At closing, the entity holding the
Flying J Franchise shall execute and deliver to BG or its
designee an assignment of said Franchise and shall deliver a

7

Bill of Sale to BG or BG's designated assignee.

(xiii) Within thirty (30) days of Bankruptcy Court approval of this Settlement, BG and Landlord's Representatives shall negotiate, execute and deliver to the Escrow Agent, who shall be Norman Gilkey, Esquire, for placement into Escrow, the following documents:

    (a)   A Consent Order For The Dismissal of BG's Chapter 11 Case;

    (b)   A Consent Order For Relief From The Automatic Stay in favor of Landlord and its Representatives; and

    (c)   A consensual surrender/termination of the May 1, 2012 Ground Lease and an award of possession to the Landlord or, as the case may be, its representatives.

Upon the filing of an Affidavit Of Default on the part of BG of any of the terms and conditions of this Settlement Agreement, addressed to the Escrow Agent, its principals and its counsel, and the failure of BG to have cured the default within twenty (20) days of the date of the Notice, the Escrow Agent shall release to and deliver to Landlord or, as directed, its representatives, the above referred to documents and Landlord, or its representatives, as the case may be, shall be free to enforce the same as permitted by law;

(xiv) The parties agree that BG, in accord with the authority accorded it under the Ground Lease of May 1, 2012, and under this Settlement Agreement, shall at its expense, have the irrevocable right, at any time, to elect to file Chapter 11 and/or Chapter 7 bankruptcy cases for Bedford County Oil Company, Inc., and Sunco Enterprises, Inc., at any time after the passage of one (1) year from the date of Closing on the acquisition of the personal property of BCOC, Simmons and/or Sunco, and Landlord and Landlord's representatives shall fully and promptly cooperate with BG's efforts in doing so. It is further agreed that all past due rents due the Landlord (Owners and Sellers herein) by BG under the Ground Lease of May 1, 2012 and all additional monthly rents coming due under the Ground Lease are abated during the remainder of the term thereof.

(xv) The parties agree that BG shall reaffirm and remain in compliance from the date of the approval of this Settlement Agreement with all disclosure and reporting requirements, financial and otherwise, as provided for under the Ground

8

Lease, applicable franchise agreements, or other applicable documents, including, upon the closing of the A-1 property, the reporting and disclosure requirements of the Note, Mortgage and Security Agreement;

(xvi) To the extent that one or more of Landlord's representatives are personal guarantors upon any franchise that is the subject of this Settlement Agreement, or the A-1, A-2 and/or A-3 properties, BG shall be obligated to obtain releases of such personal guaranties before the closing on the A-1 property;

(xvii) BG shall indemnify and hold Landlord and its representatives harmless, from any claims that may be asserted against BCOC, Simmons Realty and/or Sunco and that may affect in any way Landlord or any of Landlord Representatives;

(xviii) BG does forever release, discharge, surrender and waive any and all claims, if any, that it has or may have against any or all of the Petitioning Creditors, or their representatives, including Landlord and/or its representatives or professionals, under Section 303 of the Bankruptcy Code;

(xix) Each party hereto shall be responsible for its own legal fees and costs incurred in these proceedings, including but not limited to counsel fees;

(xx) BG shall assume and be responsible for the Susquehanna Bank line of credit obligation, and shall indemnify and hold Landlord's Representatives harmless for all claims thereon, including reasonable Attorney fees and costs and shall in any event satisfy the obligation not more than 120-days from the date of Court Approval of this Joint Motion of Movants and Debtor.

(xxi) BG and/or its assignee shall remain current and in total compliance with all of the terms, conditions, covenants and provisions of the Flying J Franchise Agreement, and in the event it is accorded notice of non-compliance/default by the Franchisor, it shall immediately notify Landlord and Landlord's representatives of its receipt of such notice and shall provide a copy of such notice to Landlord and Landlord's representatives; however, BG and/or its assignee shall have the right to renegotiate, from time to time, the Flying J Franchise Agreement for its financial benefit or in the alternative, elect to terminate the Flying J Franchise and enter into an alternate Franchise Agreement or elect to self-operate the Truck Stop facility/Premises.

*[Handwritten margin note: Jim will delete this on filed revision no other changes — JPL]*

9

(xxii) BG shall make arrangements for the payment of any
taxes, including delinquent taxes, due to the Commonwealth
of Pennsylvania, the States of Maryland and West Virginia
arising out of operations of BCOC, Sunco and/or Simmons to
the extent, if any, one or more of the Movants has personal
liability. BG shall indemnify and hold Landlord and
Landlord's representatives harmless upon any and all such
claims, including costs of defense (including counsel fees
and costs), provided, however, this indemnification language
and BG's obligations hereunder shall not be applicable to
the fuel excise taxes heretofore paid by Landlord's
representatives in the approximate amount of $791,040.91
(Thomas R. Waters, et ux, $263,680.31; Nyle Mellott, et ux,
$263,680.31; Loretta Simmons, $87,893.43; Robert K. Simmons,
$87,893.43; and Clinton Simmons, $87,893.43), it being
agreed that said claim(s) are released, surrendered,
discharged and terminated under and pursuant to this
Settlement;

(xxiii) Pending Bankruptcy Court approval of this Settlement, BG
shall nevertheless pay or cause to be paid all arrearages as
have accrued upon the Susquehanna Bank obligation and it
shall maintain said obligation in a current status,
commencing with the payment that was due August 1, 2013;

(xxiv) Should BG's employment of Clinton Simmons and/or Robert
Simmons be terminated without good cause prior to payment in
full to Sellers of the $6,000,000 purchase price for the A-2
and A-3 properties and Additional Assets, then and in such
case BG shall be deemed to have retained Clint Simmons,
Robert Simmons, Thomas Watters, Nyle Mellott, and Loretta
Simmons as consultants, at a rate of $1,000.00 per week per
individual, and shall retention and payment obligation shall
remain in full force and  effect until the said $6,000,000
portion of the purchase price shall be paid in full;

(xxv) Upon Bankruptcy Court approval of this Settlement, all
parties hereto, including Landlord and Landlord's
representatives and BG and BG's representatives shall be
deemed to have forever released, discharged, surrendered,
waived and terminated and all claim(s) that all or any of
them has against another party hereto, including Landlord
and Landlord's representatives or Tenant or Tenant's
representatives, which arose from the beginning of time to
the date hereof, excepting only obligations that heretofore
arose that were or are preserved under this Settlement
Agreement and/or obligations hereafter arising under this
Settlement Agreement; and

(xxvi) This Settlement Agreement shall become
effective, as fully as if reflected in an executed

10

settlement agreement, upon the same being approved by the
Court and said Order becoming a Final Order of Court.

10. Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy
Procedure provides, in pertinent part that, "[o]n motion and after notice
and a hearing, the court may approve a compromise or settlement."
F.R.B.P. No. 9019(a).

11. In approving a proposed compromise or settlement, the Bankruptcy
Court is required to make an "informed and independent judgment" as to
whether the compromise or settlement is "fair and equitable," based on
an:

> Educated estimate of the complexity, expense, and
> likely duration of . . . litigation, the possible
> difficulties of collecting on any judgment which
> might be obtained, and all other factors relevant to
> a full and fair assessment of the wisdom of the
> proposed compromise.

*Protective Comm. v. Anderson*, 390 U.S. 414, 424 (1968).

12. Guided by *Protective Comm.*, the Third Circuit established four
criteria that a bankruptcy court should consider when ruling on a motion
to approve settlement: (i) the probability of success in litigation; (ii)
the likely difficulties in collection; (iii) the complexity of the
litigation involved, and the expense, inconvenience and delay necessarily
attending it; and (iv) the paramount interest of creditors. *Morane v.
Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Cameron
& Mittleman v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159 (3d Cir.
2002).

13. When reviewing settlements, the Bankruptcy Court is not required
to decide the numerous questions of law and fact raised by the parties.
*See In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *Neshaminy
Office Bldg. Asso.*, 62 B.R. 798 (E.D. Pa. 1986). Instead, the Bankruptcy
Court will canvass the issues and see if the settlement falls below the
lowest point in the range of reasonableness. *Id.*

14. The parties submit that the approval of the Settlement Agreement
and Release meets the criteria established by *Protective Comm.* and
*Morane.*

15. The parties believe that the settlement as set forth above is
fair and reasonable, and in the best interests of the estate and its
creditors.

16. The parties believe that a greater "net result" for the
estate would not be likely to result from the continued litigation of
the matters in dispute, given the costs of continued litigation, and
the continued delay in bring this estate to final closure.

11

17. The parties have not promised nor been promised any consideration for agreement to the within settlement except as set forth herein.

WHEREFORE, the parties respectfully request that the Court enter an Order of Court authorizing, approving and confirming the settlement of the disputed claims at issue in accord with Bktcy R.C.P. Rule 9019 upon the terms of the settlement as set forth supra, and the Petitioning Creditors do authorize their counsel, James R. Walsh, Esquire and Spence, Custer, Saylor, Wolfe & Rose, LLC to file the within pleading on their behalf.

Spence, Custer, Saylor, Wolfe & Rose, LLC

By: /s/ James R. Walsh
James R. Walsh, Esquire
P.O. Box 280
Johnstown, Pa., 15907
Pa. I.D. # 27901
(814)536-0735
JWalsh@spencecuster.com
Attorneys For Petitioning Creditors

By:/s/ John P. Lacher
John P. Lacher, Esquire
960 Penn Avenue, Suite 1200
Pittsburgh, PA 15222
Pa. I.D. # 62297
(412) 392-0330
jlacher@lampllaw.com
Attorney for Alleged Debtor

JRW/Laptop IV/BG Petroleum, LLC/Motion To Approve Settlement Of Dispute Between Alleged Debtor/Estate and Petitioning Creditors/ 9-5-2013

EXHIBIT A
Term Sheet
January 29, 2014

Bedford Transaction -Real Estate and Assets

| Property | Tenant | Owner | Deed Info | Control# | Tax Parcel# | Acres | Assessed Value | Release Amount |
|---|---|---|---|---|---|---|---|---|
| EXHIBIT A-1 Property- To be released to Purchaser at Closing subject to a $8.6M Secured loan and payment of total $8M for the A-2,A-3,A-4 and A-5 property and Assets | | | | | | | | |
| 1 167 Post House Road | Breezewood, PA | Tri Stop, Perkins, Food Ct, Repair Center | BRE | 490/121 | 260-016091 | L10-A.01-020-A | 7.697 | | $ 8,600,000 |
| Exhibit A-2 Properties- to be released to Purchaser at Closing upon payment of individual corresponding release amount. (Total $3,773,435) | | | | | | | | |
| 1 16509 Lincoln Hwy | Breezewood, PA | Exxon #1 | BRE | 490/121 | | L09-B.07-404 | 0.734 | 499,600 | $ 649,963 |
| 2 16521 Lincoln Hwy | Breezewood, PA | Taco Bell- Land Lease | SRC | 490/121 | 260-016266 | L09-B.07-404 | 4.660 | 270,500 | $ 232,467 |
| 3 16637 Lincoln hwy | Breezewood, PA | KFC | SRC | 490/121 | | L09-B.07-406 | 0.631 | 614,400 | $ 403,508 |
| 4 16490 Lincoln Hwy | Breezewood, PA | Sunoco | SRC | 628/001 | 260-016741 | L09-B.07-410 | 0.761 | 653,600 | $ 728,609 |
| 5 16402 Lincoln hwy | Breezewood, PA | Exxon #2 | SRC | 660/218 | 260-016257 | L09-A.07-428 | 1.090 | 608,500 | $ 399,885 |
| 6 16402 Lincoln Hwy | Breezewood, PA | Dennys-Exxon | DCO/SRC | 490/121 | 260-004283 | L09-A.07-428-A-001 | 1.019 | 642,400 | $ 420,974 |
| 7 4178 Quaker Valley Road | Alum Bank, PA | SUNCO, C-store | SRC | 330/043 | 240-016366 | L09-A.07-428-001 | 1.375 | 224,600 | $ 316,715 |
| 8 430 W Industrial Blvd. | Cumberland, MD | Sunoco, Car Wash | SRC | 651/991 | 4036100 | | | 236,600 | $ 399,846 |
| 9 270 Jefferson St. | Mt. Union, PA | (Sheetz) Land Lease | SRC | 1277/317 | | | 0.220 | 78,720 | $ 171,827 |
| 10 730 Lincoln hwy | McConnellsburg, PA | (Sheetz) Land Lease | SRC | 82/224 | 0712-2 00367 | 07-08-036-000 | 0.350 | 169,120 | $ 151,496 |
| Exhibit A-3 to be released to Purchaser at Closing upon payment of individual corresponding release amount. (Total $2,129,655) | | | | | | | | |
| 1 1255 E. Main Street | Everett, PA | SUNO, Unbranded ( with car wash) | SRC | 164/312 | 080-007163 | G.09-C.05-120 | 0.413 | 240,600 | $ 263,667 |
| 2 287 Great Cove Road | Warfordsburg, MD | Exxon with C-store (Lease2-Assignment of Leasehold Interest only) | Lease | 230/300 | 262 | 03-06-0646-000 | 1.140 | | $ 6,430 |
| 3 3442 E. Pitt St. | Bedford, PA | (Puff and Snuff) Tobacco shop | SRC | 311/966 | 10-001076 | E.09-E.04-161 | 0.982 | 138,900 | $ 146,069 |
| 4 4344 Business 220 | Bedford, PA | Sheetz Retail Facility & Parking Lot | SRC | 637/584 | | | | | $ 104,624 |
| 5 4344 Business 220 | Bedford, PA | Commercial Parking Lot (Sheetz) | SRC Donan | 637/584 | 020-001966 | E.08-D.05-006-B | 3.260 | 113,200 | $ 118,301 |
| 6 1024 Industrial Ave. | Bedford, PA | Vacant Commercial Land | SRC | 371/652 | 10-001079 | E.08-E.04-161 | 0.088 | 29,890 | $ 32,880 |
| 7 914 & 918 N Spring St. | Everett, PA | Main Office; storage; 6,000 sf bldg, tanks. | SRC | 293/180 | | G.09-B.05-020 | 0.508 | 350,900 | $ 374,699 |
| 8 929 N Spring St. - | Everett, PA | Auto Service Shop- Garage | SRC | 297/23 | 08-007327 | G.09-B.05-020 | 0.668 | 189,000 | $ 197,984 |
| 9 115 W 10th St. | Everett, PA | Wood Barn Warehouse | SRC | 98/188 | 080-073461 | G.09-B.03-005-E,487 | 0.467 | 98,200 | $ 102,764 |
| 10 936 A. Spring St. | Everett, PA | Warehouse | SRC | 427/670 | 80-007073 | G.09-B.04-413 | 0.814 | 129,800 | $ 135,536 |
| 11 906 Spring St. | Everett, PA | Residential Lot | SRC | 1306/182 | 080-007046 | G.09-B.03-002-A-01 | 2.947 | 40,600 | $ 44,011 |
| 12 127 Post House | Breezewood, PA | Residential Lot | SRC | | 260-007538 | L10-A.01-033 | | 13,600 | $ 15,761 |
| 13 139 Post House | Breezewood, PA | Commercial Lot | W.T Est. | 302/197 | 260-016838 | L10-A.07-023,G | 0.168 | 132,000 | $ 137,882 |
| 14 133 Post House | Breezewood, PA | Commercial Lot | W.T Est. | 490/609 | 260-016717 | L09-B.07-010-A | 0.190 | 245,600 | $ 269,728 |
| 15 662 N. Spring St. | Everett, PA | Residential Lot | SRC | 298/761 | 80-007326 | G.09-B.03-417 | 0.990 | 14,900 | $ 17,887 |
| 16 658 N. Spring St. | Everett, PA | Parking Storage Lot | SRC | 427/670 | 80-007069 | G.09-B.04-066-A | 0.028 | 1,300 | $ 4,229 |
| 17 658 N. Spring St. | Everett, PA | Residential Lot | SRC | 427/670 | 80-007074 | G.09-B.04-114-A | 0.130 | 1,300 | $ 4,229 |
| 18 34 W 7th St. | Everett, PA | Residential Lot | SRC | 427/670 | 80-007308 | G.09-B.04-037-B | 0.261 | 1,300 | $ 4,229 |
| 19 3527 Raystown Road | Saxton, PA | Residential Lot | SRC | | 180-0121109 | H.05-0.00-052 | 0.500 | 16,800 | $ 15,249 |
| 20 2242 and Pensacola Rd | Ebensburg, PA | Commercial property; to be developed | SRC | | | | | | $ 138,734 |
| 21 Providence Township | | Commercial Lot | SRC | | | L10-A.01-034 | 0.190 | 14,200 | $ 17,163 |
| Exhibit A-4 Assets | | | | | | | | |
| 1 All Rolling Stock, Equipment, Inventory and all other Assets of Bedford County Oil Company Inc. | | | | | | | | $ 50,000 |
| Exhibit A-5 Assets | | | | | | | | |
| 1 All Rolling Stock, Equipment, Inventory and all other Assets of Sunco Enterprises, Inc. and Simmons Realty, Inc. | | | | | | | | $ 50,000 |

Total   $ 14,600,000

A8D_641113